# EXHIBIT C

## TO MEMORANDUM IN SUPPORT OF PETITION TO ENFORCE ADMINISTRATIVE SUBPOENAS

Declaration of Informant - REDACTED

(5 pages)

**DECLARATION OF** ███████████

I, ███████████, state truthfully as follows:

1. I currently reside in ███████████ Pennsylvania.

2. I am over the age of 18, and I am of sound mind, capable of making this declaration, and personally acquainted with the facts stated herein.

3. I worked for Vorteq Coil Finishers, LLC at a plant located at 125 McFann Road, Valencia, Pennsylvania, 16059 for approximately a year and five months.

4. I quit my job at Vorteq Coil Finishers, LLC on February 13, 2024.

5. My job title was Lab Tech.

6. Joe Reyes, who was killed at the plant on September 5, 2023, was a co-worker and good friend of mine. Joe had been training me and we had spent a lot of time together.

7. I was one of the first people to find Joe Reyes after he was killed on September 5, 2023.

8. On September 5, 2023, after the accident, Ed McKissick, the Plant Manager at the plant, told the workers we were not allowed to leave until we had spoken with an attorney representing Vorteq who was coming to the plant. Ed McKissick also said we were not allowed to make any phone calls until we spoke to the attorney.

9. I had to wait approximately five or six hours to speak with the Vorteq attorney, which was after the traumatic experience of finding Joe Reyes, and on top of the time I had already been working when the accident happened. During that time, I went outside to call my girlfriend because I wanted to talk to her because I was really upset. Plant Manager Ed

1

EXHIBIT C TO MEMORANDUM

McKissick came up to me and told me to get off the phone and told me not to call anyone until I met with the attorney.

10.    When I met with the Vorteq attorney, he explained who he was and I told him that I did not want to speak with him.

11.    At some point after that, I was told by Vorteq Management that they were hiring another attorney to represent Vorteq employees. I was told that Vorteq would pay for this attorney.

12.    On approximately September 29, 2023, attorney Mike Pawk came to the plant and I was told to meet with him.

13.    During that first meeting, Mr. Pawk told me that the company was paying him, but for any employees who wanted Mr. Pawk to represent them, his loyalty would be to the employees.

14.    Mr. Pawk asked me questions about the day of the accident, including what Joe Reyes's demeaner was like on the day of the accident and whether anything seemed out of the ordinary with Joe.

15.    Mr. Pawk presented me with a written contract which I signed.

16.    Mr. Pawk told me that I did not have to talk to OSHA, and said something like, "I'm just going to tell you these guys are not on your side," referring to OSHA.

17.    I met with Mr. Pawk at the plant a total of approximately two or three times.

2

EXHIBIT C TO MEMORANDUM

18.	During one of these meetings he told me that OSHA wanted to question me. He told me I could plead the fifth, or if I didn't want to plead the fifth, he advised me to say "I don't know" or "I don't remember."

19.	On multiple occasions during our meetings, Mr. Pawk repeated things like, "These guys aren't your friends," and "These guys are not there for you," referring to OSHA.

20.	During one of these meetings, Mr. Pawk told me that one of the other employees he was representing, Ethan Simmons, had decided to plead the fifth. Then he said something like, "Oops, I shouldn't have said that."

21.	I have important information about what happened immediately before the accident. Chad Wissinger, the management employee in charge of Quality Control, spoke to Joe and specifically instructed Joe to clean the prime coater machine upstairs, and instructed me to clean a different coater machine downstairs, without shutting the machines down. Joe went to clean the prime coater and that's when the accident happened.

22.	During one of my meetings with Mr. Pawk I told him that Chad Wissinger had instructed Joe to clean the prime coater without shutting it off, and Mr. Pawk said something like, "I wouldn't tell them that," referring to OSHA.

23.	Approximately one to two weeks ago, Mr. Pawk was at the plant and I met with him after my 12-hour shift. Mr. Pawk told me the OSHA interviews had been postponed.

24.	He also advised me again that when I was questioned by OSHA, I should say that "I don't know" or "I don't remember." He also said that when I was interviewed, if he thought I was about to say anything that would incriminate anyone, he would "stop the interview."

25.	During that meeting, Mr. Pawk told me for the first time that the reason he got the interviews postponed was because OSHA wanted to make a video and audio recording of the

3

EXHIBIT C TO MEMORANDUM

interview. He had never spoken to me about this before. He had never asked me if I would be comfortable being recorded. If he had, I would have told him that I didn't want to be video recorded, but I wouldn't have a problem with my interview being audio recorded.

26.    I know from past experiences as a construction foreman dealing with OSHA, and based on OSHA training classes I've taken, that OSHA is there to protect the workers. I told Mr. Pawk on multiple occasions that I would not lie to OSHA and I would tell them the truth about what happened. I knew that Vorteq was paying Mr. Pawk and I did not believe him when he said his loyalties were with the employees he was representing.

27.    On Friday February 9, 2024, at approximately 8:20 a.m., I called Mr. Pawk and left a voicemail saying that I no longer wanted to be represented by him. I said that if he had questions, he could call me back. I have not heard from Mr. Pawk since then. I have not had any second thoughts about not wanting to be represented by Mr. Pawk. I want nothing to do with him.

28.    The attorney-client privilege has been explained to me, I had an opportunity to ask questions about it, and I fully understand it. I know that the conversations I had with Mr. Pawk while he was representing me were covered by the attorney-client privilege.

29.    I understand that I have the right to waive the privilege. I have chosen to waive any attorney-client privilege with regard to my conversations with Mr. Pawk. I am choosing to do this feely of my own will because I want to share the things that Mr. Pawk said to me and I have nothing to hide. I have not been pressured in any way to waive the privilege or share this information.

30.    On Monday, February 12, 2024, while working at the plant, Quality Control Manager Chad Wissinger said to me something like, "I just want all of this stuff to be over with.

4

EXHIBIT C TO MEMORANDUM

If they don't do anything by March fifth, that's six months. All we have to do is not say anything until March fifth, then we're ok." I understood he was referring to OSHA.

31.    On Tuesday, February 13, 2024 I went to the plant and decided to quit and walked out of the plant. Nobody from the plant has contacted me since then.

32.    I did not speak with OSHA or anyone from the Department of Labor until the afternoon of February 13, 2024, after I quit and four days after I told Mr. Pawk he was not representing me.

33.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

█████████████

Dated: ███████████

5