EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

TRANSCRIPTION OF ADMINISTRATIVE INTERVIEW

OF ETHAN SIMMONS

OSHA NO. 1695874

TUESDAY, AUGUST 27, 2024

8:37 A.M.

— — —

The transcription of an administrative interview, transcribed by me, the undersigned, Tristan Hannaford, a Notary Public in and for the Commonwealth of Pennsylvania, the time and date above set forth.

— — —

NETWORK DEPOSITION SERVICES
1101 GULF TOWER
707 GRANT STREET
PITTSBURGH, PENNSYLVANIA  15219
412-281-7908

— — —

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

2

APPEARANCES VIA ZOOM:

   On behalf of Ethan Simmons:

      Lutz, Pawk & Black:
      Mike Pawk, Esquire
      mikepawk@lutzandpawklaw.com
      101 E. Diamond Street, Suite 102
      Butler, Pennsylvania  16001

   On behalf of the Department of Labor:

      U.S. Department of Labor:
      Office of the Solicitor, Region III
      Judson Dean, Esquire
      dean.judson@dol.gov
      1835 Market Street
      Mailstop SOL/22
      Philadelphia, Pennsylvania  19103-2968

ALSO PRESENT VIA ZOOM:

      Vance Delsignore

               _ _ _

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

I-N-D-E-X

EXAMINATION:                                          PAGE:

Mr. Dean                                                4


EXHIBITS:                                            MARKED:

DOL 1 - Photo                                          16

DOL 2 - Photo                                          16

DOL 3 - Photo                                          17

DOL 4 - Photo                                          17

DOL 5 - Coater Manual                                  21

DOL 6 - LOTO Procedures                                32

DOL 7 - Training Attendance Form                       34

DOL 8 - Employee Warning Record                        35

_ _ _

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

4

P-R-O-C-E-E-D-I-N-G-S

(Thereupon, the witness was adminstered the oath.)

EXAMINATION

BY MR. DEAN:

Q   Mr. Simmons, good morning.

A   Good morning.

Q   Would you please state your full name and spell your name?

A   Ethan Simmons, E-T-H-A-N, S-I-M-M-O-N-S.

Q   What is your date of birth?

A   January 9, 2004.

Q   And provide your home address and your cell phone number, please.

A   1030, Gameland Road.  Telephone number is 724-679-5529.

Q   My name is Jud Dean.  I'm an attorney with the United States Department of Labor.  For the record, this is an interview of Ethan Simmons as part of OSHA Inspection No. 1695874.

We are conducting this interview virtually by Zoom.  Present, in addition to myself and the witness and the court reporter, is Attorney Michael Pawk, representing the witness, and OSHA Compliance Officer Vance Delsignore,

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

EXHIBIT B TO JOINT STATUS REPORT

## NETWORK DEPOSITION SERVICES
### Transcript of Ethan Simmons

5

last name spelled D-E-L-S-I-G-N-O-R-E.

Mr. Simmons, I'm going to start by explaining the groundrules for the interview today, and then you can let me know if you have any questions, and then we can start.

Of course I'm going to be asking some questions, and you are going to be answering some questions. The court reporter is recording everything that we say. So it is important that we speak slowly and clearly and loudly.

Do you understand that?

A   Yes.

Q   We need to try to communicate verbally, because things like shaking your head or nodding your head, the court reporter can't record that.

Do you understand?

A   Yes.

Q   It is also important that we try not to speak over each other. Sometimes as things get flowing and we get more comfortable in conversation, it is natural to speak over each other to some extent.

That is also hard for the court reporter to record. So please let me finish my question before you answer, even if you know where I'm

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

going, and I'll do the same for you when you are answering questions.

Do you understand?

A   Yes.

Q   A couple more questions I need to ask you.  Have you had anything alcoholic to drink in the last eight hours?

A   No.

Q   Are you sick in any way today?

A   No.

Q   Are you taking any kinds of drugs or medication that would interfere with your ability to understand my questions and answer them accurately and truthfully?

A   No.

Q   Mr. Simmons, it is very important that you understand my questions before you answer them.  So if you don't understand anything about the question, terminology that I'm using, and you are not sure what I mean by it, or you want me to rephrase the question, please just let me know, because if you do answer a question, we are going to assume that you understood it.

Does that make sense?

A   Yes.

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

Q   You have been placed under oath.  Do you understand that?

A   Yes.

Q   And I just want to make sure you are aware of the potential consequences if for any reason you are not honest today.  And I'm not assuming you won't be honest, but I just want to make sure you are aware of this.

There is a law.  It is found at 18 USC 1001.  That is just the legal citation, and that law makes it a crime to, one, conceal or cover up any relevant factual information, or, two, to make any false or fraudulent statement.

And anyone committing those crimes when speaking with a federal agent can be fined and/or imprisoned.

Do you understand all that?

A   Yes.

Q   Any questions about the process before we start?

A   No.

Q   Mr. Simmons, who is your current employer?

A   Vorteq Coil Finishers.

Q   And you did cut out there very briefly.

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

Did you say Vorteq?

A    Correct.

Q    And for the record, that is V-O-R-T-E-Q?

A    Yes.

Q    C-O-I-L, and then the last word is Finishers; correct?

A    Correct.

Q    What is your current job title or position?

A    Supervisor.

Q    Is it any more specific than that, or just supervisor?

A    Paint line supervisor.

Q    And you said paint line?

A    Yes.

Q    Were you in that same position at the time that Mr. Reyes, R-E-Y-E-S, was killed?

A    No.

Q    What was your position or job title at that time?

A    Operator.

Q    And, again, was it any more specific than that?  Operator in a certain area?

A    Exit end operator.

Q    And you said exit end?

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

9

A   Correct.

Q   When did you start working for Vorteq?

A   I think it was in 2022, September.

Q   And what was your job title at that time?

A   Lab technician.

Q   So when you started in approximately September 2022, you were a lab technician?

A   Yes.

Q   And then was your next position the exit end operator?

A   Yes.

Q   There wasn't anything between that?

A   No.

Q   Do you recall approximately when you became an exit end operator?

A   No.

Q   Do you recall approximately how many months after you started, for example?

A   No.

Q   Was it within the first let's say two months?

A   No.

Q   And then once you were a lab -- once you were an exit end operator, was your next position

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

supervisor on the paint line?

    A   Yes.

    Q   Again, there was nothing in between that?

    A   No.

    Q   Approximately how long have you been a supervisor?

    A   I believe since January.

    Q   That is of this year, 2024?

    A   Yes.

    Q   I want to go through these three positions and just get a summary of your job duties in each position.  This is just a summary. I'm not going to hold you to this being all that you did.  I'm sure you did a lot of things.

    But starting with your first position, lab technician, can you give me a summary of what you did?

    A   So you test the color on the coil, you do physicals, make sure the paint is not coming off or anything, pretty much the quality control guy.

    Q   During the period of time when you were a lab tech, who was your supervisor or who were your supervisors?

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

11

A   Mike Gray, Tim Draxinger and Larry Hoff and Bob Williams.

Q   Do you happen to know if Gray is G-R-A-Y or G-R-E-Y?

A   No, I'm not sure.

Q   And do you know how Draxinger is spelled?

A   No.

Q   Is Hoff H-O-F-F, as far as you know?

A   Yes.

Q   And did you work one particular shift the whole time you were a lab tech, or did that change?

A   No, we were on rotating shifts.

Q   Am I correct there are three shifts at the plant?

A   There are two right now.

Q   Are there sometimes three?

A   Yes.

Q   All right.  And then when you became an exit end operator, what were your job duties?

A   To cut out the splices that were in the line, inspect coil while it was running, visually look at it while it was running, make sure there is no defects.

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

12

After you order a quantity, how much you were running, also set up on -- the operator also set up the bottom side, the finish coaters.

Q   All right.  And during the time that you were an exit end operator, who were your supervisors?

A   Mike Gray, Larry Hoff, Joe Reyes, Bob Williams.

Q   Again, when you were an operator, did your shifts rotate?

A   Yes.

Q   And you said you were an operator at the time that Mr. Reyes was killed.  What shift was that on?  I'm sorry, were you working at the time he was killed?

A   Yes.

Q   And what shift was that on?

A   7A to 7P.

Q   Mr. Simmons, we have heard from some other employees that the company's management told them, after the accident where Mr. Reyes was killed, not to speak with OSHA about the accident or the conditions at the plant.

Did any of the company's management ever instruct you not to speak with OSHA?

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

13

A   On the advice of counsel, I invoke my 5th Amendment privilege against self incrimination and respectfully decline to answer your question.

Q   Did any of the company's management ever discourage you from talking with OSHA?

A   On the advice of counsel, I invoke my 5th Amendment privilege against self incrimination and respectfully decline to answer your question.

Q   Did any of the company's management ever pressure you to withhold information from OSHA?

A   On the advice of counsel, I invoke my 5th Amendment privilege against self incrimination and respectfully decline to answer your question.

MR. DEAN:  And let me just ask, Mr. Pawk, I'm guessing a lot of the answers will be along the same lines.

Do you want to have an agreement, just to make it easier on everybody, that if the witness says 5th Amendment, that what he means is that full answer?

MR. PAWK:  Yes, that is fine.

Q   So, Mr. Simmons, you understand what I

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

14

just proposed?

A   Yes.

Q   I want to make sure that you understand that under the OSHA statute, employees have a right not only to speak with OSHA, but to speak with OSHA privately, and I don't mean without an attorney, I just mean without anyone else present.

Did you understand that before you came in today?

A   Yes.

Q   Am I correct that Mr. Pawk is representing you at this interview?

A   Yes.

Q   Have you chosen of your own free will to have Mr. Pawk represent you?

A   Yes.

Q   Did you at any times feel any pressure by Vorteq or anyone else to have Mr. Pawk represent you?

A   No.

Q   Are you aware that there is a different attorney at a different law firm representing Vorteq in this matter?

A   Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

15

Q   Do you happen to be familiar with that attorney named Patrick Dennison?

A   Yes.

Q   Am I correct that Mr. Pawk is representing you at this interview, and not Mr. Dennison?

A   Yes.

Q   And, again, you have made that decision of your own free will?

A   Yes.

Q   I want to get some terminology correct between us and make sure we are referring to the same things.

First of all, the machine work Mr. Reyes was killed, do you refer to that as the prime coater machine?

A   Yes.

Q   I'm going to be sharing some exhibits with you.  If we were in the same room, as we used to do before the pandemic, I would be handing exhibits to you, and you would look at them and all that.

I'm going to instead share my screen. You can let me know if you can see the exhibit clearly, which I'm going to do in just a moment,

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

16

and then we can talk about those exhibits.

So let me make sure.  Are you currently able to see that photograph?

A   No.

Q   Let me try this again.  Are you able to see it now?

A   Yes.

Q   And for the record, this electronic file is IMG_0197.  We are going to refer to this as DOL 1.

(Thereupon, Exhibit DOL 1 was marked for identification.)

Q   Do you recognize this as showing the front end of the prime coater?

A   Yes.

Q   And am I referring to it the same way you do when I say front end or the front?

A   Yes.

Q   I'm going to share a second photo with you in just a moment.

This is a slightly different picture. For the record, this is 0198, and this will be DOL 2.

(Thereupon, Exhibit DOL 2 was marked for identification.)

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

17

Q   Can you see that photo?

A   Yes.

Q   That is also a picture of the front of the prime coater?

A   Yes.

Q   I'm sharing the third photograph with you now.  For the record, this is 0192.

(Thereupon, Exhibit DOL 3 was marked for identification.)

Q   Do you recognize this as the back of the prime coater?

A   Yes.

Q   I'm going to share one more at the moment.  This is 0195.  We are going to call this DOL 4.

(Thereupon, Exhibit DOL 4 was marked for identification.)

Q   Do you recognize this, also, as the back of the prime coater?

A   Yes.

Q   Now, I want to talk about this machine and the accident in which Mr. Reyes was killed. I understand and appreciate you were working at the time.

I believe, as we can talk about, you

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

18

were one of the people who went to the scene of the accident.  I assume it was difficult and traumatic for you, and I apologize for having to get into the details of this, but you understand I'm just doing my job.

First of all, did you consider Mr. Reyes to be a friend of yours?

A    Yes.

Q    What is your understanding, Mr. Simmons, of how the accident occurred, that resulted in his death?

A    5th Amendment.

Q    What is your understanding of what Mr. Reyes was doing at the time that he was killed?

A    5th Amendment.

Q    Am I correct that you were one of the people who found Mr. Reyes after the accident?

A    5th Amendment.

Q    Prior to that accident, Mr. Simmons, did you consider the prime coater machine to be a dangerous machine?

A    5th Amendment.

Q    Prior to the accident, did you consider cleaning the rolls on the prime coater to be a

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

19

dangerous task to perform?

A   5th Amendment.

Q   Mr. Simmons, have you ever personally been injured on the prime coater machine?

A   5th Amendment.

Q   And if I wanted to ask you about any injuries that you have had or whether any supervisors knew that you might have been injured on the machine, would you give the same answer, 5th Amendment?

A   Yes.

Q   Are you aware of any other individuals who have ever been injured while working on the prime coater?

A   5th Amendment.

Q   According to a couple of people that we have spoken with -- well, first of all, you are familiar with an individual named Mr. Barkley, Timothy Barkley?

A   Yes.

Q   According to a couple people we have spoken to, Mr. Barkley got his arm pulled into the rolls on the prime coater many years ago. Were you aware of that accident?

A   5th Amendment.

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

20

Q    We have also heard that Michael Trinkley got his hand or arm caught in the prime coater machine.   Were you aware of that?

A    5th Amendment.

Q    We also heard -- let me ask you, we have heard from at least one person that there was an employee in May of 2023 who got his arm caught in the machine, and that he was about 19 years old, and he quit after that accident.

Were you aware of that?

A    5th Amendment.

Q    Have you had any incidents on the prime coater machine, where you were almost injured, but you managed to avoid being injured?

A    5th Amendment.

Q    Have there been any times where you were cleaning the rolls on the prime coater, and a rag that you were using got pulled into the rolls?

A    5th Amendment.

Q    Let me ask you this.

At any time before the accident where Mr. Reyes was killed, did you ever clean the rolls on the prime coater machine?

A    5th Amendment.

Q    Did you ever clean the rolls using a rag

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

21

and a chemical to help clean the machine?

A    5th Amendment.

Q    If Mr. Reyes had been cleaning the rolls while the rolls were rotating, when this accident occurred, if that were the case, would that have been an unusual thing for an employee to be doing?

A    5th Amendment.

Q    Were there any rules in place at the plant, that you were aware of, before the accident, that said employees should not clean the prime coater rolls while the machine was running?

A    5th Amendment.

Q    Do you in any way blame Mr. Reyes for the accident?

A    5th Amendment.

Q    I'm going to show you another exhibit. We will call this DOL 5.

(Thereupon, Exhibit DOL 5 was marked for identification.)

Q    Can you see this first page of the exhibit?

A    Yes.

Q    Do you see that it says S coater at the

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

22

top line?

A   Yes.

Q   And do you see, if you skip a line after that, it says for Napco Inc., Valencia, Pennsylvania.

Do you see that?

A   Yes.

Q   Do you know what Napco Inc. is?

A   No.

Q   The plant where you worked, where Mr. Reyes was killed, is in Valencia, Pennsylvania; correct?

A   Yes.

Q   This is a 17 page document.  Again, if we were in person, I would hand this to you, and you would be able to look through it.  I'm going to zoom out just a bit.

And at the moment I'm just going to ask you if you have seen this before.  So I'm going to scroll through the pages.  I know you don't have time to read it at the moment, but I just want you to take a glance at it.

So I just scrolled through the 17 pages. I'm going to go back to the first page.  Having glanced through all the pages, have you ever seen

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

23

this document before?

A    No.

Q    Did you know before today that this kind of document even existed?

A    5th Amendment.

Q    I'm going to turn to the fifth page. I'll zoom in a little bit.  Can you take a moment to read through that page, please, and let me know when you are done?

A    Done.

Q    Were you aware before today that the manufacturer of the prime coater warns that the machine must be stopped before wiping the rolls?

Were you aware of that before today?

A    5th Amendment.

Q    Do these warnings about stopping the machine before wiping the rolls surprise you?

A    5th Amendment.

Q    Before the accident, did you ever clean the rolls on the prime coater while the machine was running?

A    5th Amendment.

Q    At any time after the accident occurred, have you cleaned the rolls on the prime coater while the machine was running?

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

24

A   5th Amendment.

Q   At any time before the accident, did you ever see mister -- I'm sorry, first let me ask you.  You are familiar with someone named Mr. McKissick?

A   Yes.

Q   For the record, I believe that is M, little C, capital K, I-S-S-I-C-K.

What is Mr. McKissick's current position?

A   Plant manager.

Q   Was he the plant manager at the time of the accident?

A   Yes.

Q   At any time before the accident, did you ever see Mr. McKissick clean the rolls on the prime coater while the machine was running?

A   5th Amendment.

Q   You are familiar with someone named Mr. Wissinger?

A   Wissinger?

Q   Sorry, Wissinger.

A   Yes.

Q   I believe that is W-I-S-S-I-N-G-E-R.

What is his current position?

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

25

A   Quality control.

Q   Was that his position at the time of the accident?

A   Yes.

Q   At any time before the accident, did you see Mr. Wissinger cleaning the rolls on the prime coater while the machine was running?

A   5th Amendment.

Q   You are familiar with someone named Mr. Mahon?

A   Yes.

Q   Am I pronouncing that right?

A   Yes.

Q   And that is M-A-H-O-N.

What is his current position?

A   He is retired now.

Q   What was his position at the time of the accident?

A   He was maintenance supervisor.

Q   Did you ever see, before the accident, Mr. Mahon cleaning the rolls of the prime coater while the machine was running?

A   5th Amendment.

Q   If any of the managers or supervisors from the plant stated that they were unaware

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

26

before the accident that employees cleaning the rolls while the machine was running -- I'm sorry. Let me restate the question.

If any of the managers or supervisors stated that they were unaware, before the accident, that employees ever cleaned the rolls while the machine was running, what would your response be?

A    5th Amendment.

Q    Did you at any time before the accident ever hear a supervisor or manager say that the rolls should be cleaned while the machine is running, because turning it off would take too much time?

A    5th Amendment.

Q    Are you aware of any employees before the accident ever being disciplined or criticized for turning off the prime coater, in order to clean the rolls?

A    5th Amendment.

Q    On the same exhibit, DOL 5, on the same page, page five, do you see in the list of five items, that item five says never remove guards while machine is running?

A    Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

27

Q    At any time before Mr. Reyes was killed, did you ever observe any guards on the prime coater machine?

A    5th Amendment.

Q    At any time before the accident, did you ever hear about the prime coater machine having any guards, even if you didn't observe them?

A    5th Amendment.

Q    At any time before the accident, did you ever hear that the company was intending to install some kind of guarding on the prime coater?

A    5th Amendment.

Q    I'm going to turn to page 15 of this same Exhibit DOL 5, and I'm going to zoom in, so you can read.

Do you see about seven or eight lines down, where it says think before you act, and be careful?

A    Yes.

Q    Under that, do you see where it says safety precautions?

A    Yes.

Q    And then item two, do you see that it says disconnect and lock out all power sources

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

28

before doing any maintenance on equipment or cleaning equipment?

Do you see that?

A    Yes.

Q    Based on your familiarity with the prime coater machine, can you explain to me how you would go about disconnecting and locking out all power sources on the prime coater?

A    5th Amendment.

Q    Are you familiar with the term lockout/tagout?

A    5th Amendment.

Q    Were you ever trained on lockout/tagout for the prime coater machine before the accident?

A    5th Amendment.

Q    Have you been trained on lockout/tagout since the accident?

A    5th Amendment.

Q    Have you ever seen any written lockout/tagout procedures for the prime coater?

A    5th Amendment.

Q    Were you ever trained on any lockout/tagout for any other equipment in the plant?

A    5th Amendment.

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

29

Q    At any time before the accident, did you personally ever lockout and tagout the prime coater machine?

A    5th Amendment.

Q    Would you have known before the accident how to go about locking out the prime coater?

A    5th Amendment.

Q    Do you know how long it would take to lockout and tagout the prime coater?

A    5th Amendment.

Q    Before the accident, did you ever see anyone else lockout and tagout the prime coater?

A    5th Amendment.

Q    At any time before the accident, were you ever specifically instructed by a manager or supervisor to clean the rolls on the prime coater without turning off the machine?

A    5th Amendment.

Q    Do you know if there is a way to reverse the direction of the rolls at the back of the machine, so you can clean them without potentially getting pulled in?

A    5th Amendment.

Q    I'm going to scroll down on this same page 5 of DOL 5.

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

30

Do you see that item 11 says identify locations of emergency stop push-buttons and trip bars before operating equipment?  Do you see that?

A    Yes.

Q    Do you know if the prime coater has any emergency stop buttons?

A    5th Amendment.

Q    Do you know what a trip bar is?

A    5th Amendment.

Q    Did you ever personally trip one of the trip bars?

A    5th Amendment.

Q    Do you know what an E-stop is?

A    5th Amendment.

Q    Before the accident, were there any E-stops on the prime coater?

A    5th Amendment.

Q    Did you personally or did you ever see anyone use an E-stop on the prime coater?

A    5th Amendment.

Q    At any time since the accident occurred, have there been any changes in rules or procedures for cleaning the rolls on the prime coater?

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

31

A   5th Amendment.

Q   At any time since the accident, has there been any training on any rules about how to clean the rolls on the prime coater?

A   5th Amendment.

Q   Is it now required at the plant that the prime coater be locked out before cleaning the rolls?

A   5th Amendment.

Q   At any time since the accident, have you seen other employees clean the rolls on the prime coater while it was still running?

A   5th Amendment.

Q   At any time since the accident, have you seen any managers or supervisors clean the rolls of the prime coater while the machine was running?

A   5th Amendment.

Q   After the accident, did the plant make any changes to the guarding on the prime coater?

A   5th Amendment.

Q   Are you aware or familiar with a person named Mr. Hinton, H-I-N-T-O-N?

A   No.

Q   Are you familiar with a person named Jim

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

32

Boyle, B-O-Y-L-E?

A    Yes.

Q    Who is he?

A    I believe he is the CEO of the company.

Q    Have you ever met Mr. Boyle in person?

A    No.

Q    I'm going to show you another exhibit. We'll call this DOL 6.

(Thereupon, Exhibit DOL 6 was marked for identification.)

Q    Can you see that document?

A    Yes.

Q    This is four pages. I'm going to do the same thing. I'm going to scroll fairly quickly through the pages, just for you to take a glance.

I scrolled through the four pages. Before today, have you ever seen this document before?

A    No.

Q    So the first page, do you see at the top it says equipment lockout/tagout procedure?

A    Yes.

Q    Under that, it says machine name and number, and under that it says coil coating, entire coil coating line shutdown-metal strip.

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

33

Do you see that?

A    Yes.

Q    Can you just explain to me what the
entire coil cutting -- sorry, can you explain to
me what the entire coil coating line means?

A    5th Amendment.

Q    At any time before the accident, did you
receive any training on any lockout/tagout
procedures for the prime coater?

A    5th Amendment.

Q    I'm on page two, and I'll zoom in.

Do you see this last sentence that
starts with the words "this procedure was
reviewed"?

A    Yes.

Q    Have you read that sentence over to
yourself?

A    Yes.

Q    Have you ever heard of a maintenance
lockout/tagout safety development and training
committee?

A    5th Amendment.

Q    I'm going to show you another exhibit.
This will be DOL 7.

_ _ _

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

34

(Thereupon, Exhibit DOL 7 was marked for identification.)

Q   This is a seven page exhibit.  Let's start off by scrolling through the first couple of pages.  So here is page one.  Actually, let's just start with page one.

So do you see at the top of page one, it says Vorteq Coil Finishers training attendance form?

A   Yes.

Q   On this particular form, I don't see your name or signature.  Would you agree with me?

A   Yes.

Q   Have you ever signed a form like this for training?

A   5th Amendment.

Q   And do you see the fourth line from the top, it says lockout/tagout on page one?

A   Yes.

Q   I'm scrolling down to page six.  This is a similar form, but do you see four lines down, it says machine guard safety?

A   Yes.

Q   Am I correct your name and signature is not on this specific form; right?

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

35

A    Yes.

Q    Have you ever signed a form like this for machine guard safety?

A    5th Amendment.

Q    I'm going to share another exhibit. This is going to be DOL 8.

(Thereupon, Exhibit DOL 8 was marked for identification.)

Q    Can you see that document?

A    Yes.

Q    This is just a one paged document.  So I'm just scrolling down.

Do you see at the top of the document, it says employee warning record?

A    Yes.

Q    Have you ever seen a document, whether it was completed or not yet completed, called employee warning record?

A    5th Amendment.

Q    Have you ever been the subject of an employee warning record form?

A    5th Amendment.

Q    Have you ever been disciplined for anything at the plant while you have been working there?

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

36

A    5th Amendment.

Q    Have you ever been instructed that you are required to wear safety glasses while working at the plant?

A    5th Amendment.

Q    Am I correct that safety glasses are not required to be worn at the plant?

A    5th Amendment.

Q    Mr. Simmons, do you know if any of the managers or supervisors get paid different amounts or different hourly rates, depending on the kind of job that is running?

A    5th Amendment.

Q    Do you know if any of the managers or supervisors get paid different amounts, depending on production?

A    5th Amendment.

Q    Based on all your experience working at the plant, do you feel that management and supervisors generally prioritize production over safety?

A    5th Amendment.

Q    Have you ever made any complaints about safety to any supervisors or managers?

A    5th Amendment.

EXHIBIT B TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

37

Q    Are you aware of any other employees who have made complaints about safety to supervisors or managers?

A    5th Amendment.

Q    Before the accident, was there anyone specifically in charge of safety at the plant?

A    5th Amendment.

Q    Is there anyone currently in charge of safety at the plant?

A    5th Amendment.

Q    Are you familiar with a phrase that I believe is used at the plant called walking the line or walking the paint line?

A    5th Amendment.

Q    I'm going to go back for a moment to the photograph that is DOL 1.

Do you see that?

A    Yes.

Q    In the bottom left area of the photo, do you see something that appears to be a brown rectangle?

A    Yes.

Q    Do you know what that is, based on your experience at the plant?

A    5th Amendment.

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

38

Q    When employees are walking the line or walking the paint line, do they sometimes stand on this brown surface to observe the prime coater running?

A    5th Amendment.

Q    Are you aware of any employees ever getting pulled into the rollers, here at the front of the machine, while observing the machine?

A    5th Amendment.

Q    Do you know if Mr. Reyes was specifically instructed immediately before the accident to clean the prime coater while the rolls were running?

A    5th Amendment.

Q    We are now looking at DOL 3, which is image 0192.  You said you recognized this as the back of the prime coater; right?

A    Yes.

Q    Do you see what appears to be a yellow gate?

A    Yes.

Q    Do you know what that is?

A    5th Amendment.

Q    All right, Mr. Simmons, it's been a

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

39

little over an hour.  I would like to take a break for approximately ten minutes.  So we'll come back at about 9:46 or so.

All right?

A    Yes.

(Recess taken.)

Q    Just a few more questions, Mr. Simmons.

Immediately after the accident, did you see what position Mr. Reyes' body was in?

A    5th Amendment.

Q    Did Mr. McKissick come to the scene of the accident within the first few minutes after the accident?

A    5th Amendment.

Q    Did you hear Mr. McKissick say anything at the scene of the accident?

A    5th Amendment.

Q    Did you hear Mr. McKissick say anything blaming Mr. Reyes for the accident?

A    5th Amendment.

Q    All right, so those are all the questions I have, Mr. Simmons.  I thank you for your time.

And, Mr. Pawk, we should discuss the next two witnesses.

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

40

THE COURT REPORTER:  Would you like a transcript?

MR. PAWK:  Email.

(Thereupon, the administrative interview was concluded at 9:48 a.m.)

— — —

**NETWORK DEPOSITION SERVICES**
**Transcript of Ethan Simmons**

41

CERTIFICATE

COMMONWEALTH OF PENNSYLVANIA, )
                                ) SS:
COUNTY OF ALLEGHENY.            )

I, Tristan Hannaford, do hereby certify that before me, a Notary Public in and for the Commonwealth aforesaid, personally appeared Ethan Simmons, who then was by me first duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth in the taking of his oral administrative interview in the cause aforesaid; that the testimony then given by him as above set forth was by me reduced to stenotypy in the presence of said witness, and afterwards transcribed by means of computer-aided transcription.

I do further certify that this administrative interview was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

I do further certify that I am not a relative, counsel or attorney of either party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Pittsburgh, Pennsylvania, on this 30th day of August, 2024.

_____
Tristan Hannaford, Notary Public
My commission expires September 17, 2027

- - -

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**