**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

TRANSCRIPTION OF ADMINISTRATIVE INTERVIEW

OF MICHAEL TRINKLEY

OSHA NO. 1695874

TUESDAY, AUGUST 27, 2024

10:17 A.M.

— — —

The transcription of an administrative interview, transcribed by me, the undersigned, Tristan Hannaford, a Notary Public in and for the Commonwealth of Pennsylvania, the time and date above set forth.

— — —

NETWORK DEPOSITION SERVICES
1101 GULF TOWER
707 GRANT STREET
PITTSBURGH, PENNSYLVANIA  15219
412-281-7908

— — —

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

2

APPEARANCES VIA ZOOM:

On behalf of Ethan Simmons:

Lutz, Pawk & Black:
Mike Pawk, Esquire
mikepawk@lutzandpawklaw.com
101 E. Diamond Street, Suite 102
Butler, Pennsylvania  16001

On behalf of the Department of Labor:

U.S. Department of Labor:
Office of the Solicitor, Region III
Judson Dean, Esquire
dean.judson@dol.gov
1835 Market Street
Mailstop SOL/22
Philadelphia, Pennsylvania  19103-2968

ALSO PRESENT VIA ZOOM:

Vance Delsignore

_ _ _

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

3

I-N-D-E-X

EXAMINATION:                                     PAGE:

Mr. Dean                                            4


EXHIBITS:                                        MARKED:

DOL 1 - Photo                                       28

DOL 5 - Coater Manual                               15

DOL 6 - LOTO Procedures                             24

DOL 7 - Training Attendance Form                    26

DOL 8 - Employee Warning Record                     27




                        - - -

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

4

P-R-O-C-E-E-D-I-N-G-S

(Thereupon, the witness was adminstered the oath.)

EXAMINATION

BY MR. DEAN:

Q   Mr. Trinkley, can you state your full name and spell your name, please?

A   It is Michael John Trinkley, M-I-C-H-A-E-L, J-O-H-N, T-R-I-N-K-L-E-Y.

Q   Tristan, go off the record for one second.

(Discussion off the record.)

Q   Mr. Trinkley, what is your date of birth?

A   August 31, 1972.

Q   Your cell phone number?

A   724-355-6062.

Q   And your home address, please?

A   104 Elmwood Lane, Butler, PA  16001.

Q   My name is Jud Dean.  I'm an attorney with the United States Department of Labor.  I represent OSHA in this inspection.

For the record, this is an interview of Michael Trinkley, as part of OSHA Inspection No. 1695874.  We are conducting this interview

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

5

virtually by Zoom.

Present, in addition to myself, the witness and the court reporter, is Attorney Michael Pawk, representing the witness, and OSHA Compliance Officer Vance Delsignore.

Mr. Trinkley, I'm going to start by explaining the groundrules for the interview, and then you can let me know if you have any questions, and then we can start.

Is that all right?

And if you have anything urgent going on, we can take a break.  It is no problem.

A    No, I had a new phone, I thought I had everything silenced.

Sorry about that.

Q    No problem.

Mr. Trinkley, I'm going to be asking you questions, and you are going to be answering my questions.  The court reporter is recording everything that we say.  So it is important that we speak slowly and clearly and loudly.

Do you understand that?

A    Yes, sir.

Q    We need to try to communicate verbally, because things like shaking your head or nodding

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

your head can't be recorded.  So we'll try to remember to do that.

Do you understand?

A    Yes.

Q    It is also important that we try not to speak over each other, which sometimes happens in normal conversation, because that also makes it hard for the court reporter.

So please let me finish my questions before you start answering, and I'll do the same for you.  Do you understand?

A    Yes, sir.

Q    A couple of questions I have to ask you, have you had anything alcoholic to drink in the last eight hours?

A    No, sir.

Q    Are you sick today?

A    No, sir.

Q    Are you currently taking any kinds of drugs or medications that would interfere with your ability to understand my questions and answer them accurately and truthfully?

A    No, sir.

Q    It is also very important that we make sure you understand my questions before you

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

7

answer them.

So if for any reason you don't understand a question, if you don't understand a term that I'm using, please ask me to explain, ask me to rephrase the question.

We just want to make sure you understand it before you answer, because if you do answer, we'll assume that you understood it.

Does that make sense?

A   Yes, sir.

Q   You have been placed under oath.  You understand that?

A   Yes, I do.

Q   And let me just make sure you are aware of what the potential consequences could be if for any reason you are not honest today.  And I don't mean in any way to assume that you are going to be anything less than honest, but I just want to make sure you are aware of this.

There is a law found at 18 USC 1001, that is just the legal citation, that makes it a crime to, one, conceal or cover up any relevant factual information, and, two, to make any false or fraudulent statements.

Do you understand that?

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

8

A   Yes, sir.

Q   And if you violate that law, you can be fined or imprisoned.

Do you understand all that?

A   Yes, sir.

Q   That is the process and the groundrules. Do you have any questions before we jump in?

A   No, sir.

Q   Who is your current employer?

A   Vorteq Coil Finishers.

Q   What is your current job title or position?

A   Maintenance technician.

Q   How long have you worked for Vorteq?

A   Five years.

Q   When you first started, were you a maintenance technician then?

A   Yes.

Q   And the entire time you have been there, you have been a maintenance technician?

A   No.  For a short period I was removed from maintenance and put back on the paint line, and then I returned back to maintenance on a short-term afterwards.

Q   Approximately, when was that?

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

9

A   I would say, probably, maintenance for six months.  Then I was pulled off, put on a paint line for another job, and then I returned back to the paint line probably three months later.

Q   So after about six months working at Vorteq, you were pulled off to work on the line. You did that for about three months, and then you went back to maintenance technician; is that right?

A   Yes.

Q   Can you give me a summary of your job responsibilities as a maintenance technician?

And at the moment I just need a summary. If you leave something out, it is fine.  I'm not going to hold you to it.

A   Just maintaining the line, fixing it wherever it is needed, doing daily repairs for upkeep.

Q   And did you say daily repairs?

A   Yeah.  Like PM, preventative maintenance.

Q   Mr. Trinkley, we have heard from other employees that some of the company's management told them, after the accident where Mr. Reyes was

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

10

killed, not to speak with OSHA about the accident or conditions at the plant.

Did any of the company's management ever instruct you not to speak to OSHA?

A   On the advice of counsel, I invoke my 5 Amendment privilege against self incrimination and respectfully decline to answer your question.

Q   And in terms of that response, can we have an agreement, just to make it easier for everybody, you can say 5th Amendment, and we'll all know what you mean is that full response?

Is that okay with you and your attorney?

A   Yes.

Q   Did any of the company's management ever discourage you from speaking to OSHA?

A   5th Amendment.

Q   Did any of the company's management ever pressure you to withhold information from OSHA?

A   5th Amendment.

Q   I want to make sure that you are aware that under the OSHA statute, employees have a right not only to speak with OSHA, but to speak with OSHA privately.

Did anyone tell you about that before today?

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

11

A   5th Amendment.

Q   Am I correct that Mr. Pawk is representing you at this interview?

A   Yes, he is.

Q   Have you chosen of your own free will to have Mr. Pawk represent you?

A   Yes, I have.

Q   Do you feel in any way pressured by Vorteq or anyone else to have Mr. Pawk represent you?

A   Absolutely not.

Q   You are aware there is a separate attorney and a separate law firm representing Vorteq; is that right?

A   Yes.

Q   Have you heard the name Patrick Dennison as the attorney representing Vorteq?

A   I don't know.  I can't say if I did or not.

Q   Am I correct you have chosen to have Mr. Pawk represent you, and not the attorneys representing the company?

A   Correct.

Q   Do you use the term "prime coater" to refer to the machine where Mr. Reyes was killed?

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

12

A   Yes, sir.

Q   And is the prime coater part of a bigger process that you refer to as the paint line?

A   I'm not sure I understand what you are asking.

Q   If you were at the plant and someone asked you to walk the paint line, would you know what they are asking?

A   Yeah.

Q   So paint line is a term that you are comfortable with for the entire line of the process?

A   Yes, sir.

Q   Did you consider Mr. Reyes to be a friend of yours before the accident?

A   Absolutely.  Good friend of mine.

Q   Were you friends outside of work?

A   Yeah.  I had met him before he even started working here.

Q   Did you suggest that he apply for the job, or help him apply?

A   No, sir.

Q   How did you first meet him?

A   He had a tattoo shop in Butler.

Q   So were you a client of his?

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

A    Yes.

Q    Did you ever meet his wife or his family?

A    I have, yes.

Q    Is that before the accident or after or both?

A    Before the accident.

Q    Mr. Trinkley, do you blame Mr. Reyes for the accident?

A    5th Amendment.

Q    What is your understanding of how the accident occurred?

A    5th Amendment.

Q    What is your understanding of what Mr. Reyes was doing at the time of the accident?

A    5th Amendment.

Q    Did you observe the scene of the accident after it occurred?

A    5th Amendment.

Q    Prior to the accident, did you consider the prime coater machine to be a dangerous machine?

A    5th Amendment.

Q    Prior to the accident, did you consider the task of cleaning the rolls on the prime

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

14

coater to be a dangerous task?

A    5th Amendment.

Q    Am I correct that you personally have been injured on the prime coater machine at one point?

A    5th Amendment.

Q    If you had been injured, do you know if any supervisors or managers knew about your injury?

A    5th Amendment.

Q    Are you aware of any other individuals who have been injured while working on the prime coater machine?

A    5th Amendment.

Q    Do you know if before the accident any managers or supervisors were aware of any employees getting injured on the prime coater?

A    5th Amendment.

Q    Have you ever had any incidents, working on the prime coater, when you were almost injured but you managed to avoid being injured?

A    5th Amendment.

Q    Have there been any times where you have been cleaning the rolls on the prime coater with a rag, and the rag got pulled into the rolls?

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

15

A   5th Amendment.

Q   If Mr. Reyes had been cleaning the rolls at the time of the accident, while the machine was running, and using a rag, would that have been an unusual thing for an employee to do?

A   5th Amendment.

Q   If that is what he had been doing, would that have been a violation of any rules at the plant at the time?

A   5th Amendment.

Q   All right, I'm going to share a couple of documents with you, and the way we'll do this is I'll share my screen.  We can make sure that you see the document, and then I'll ask you questions about it.

The first document I'm going to show you has been marked DOL 5.

(Thereupon, Exhibit DOL 5 was marked for identification.)

Q   This is a 17 page document.  If we were in person in the same room, I would just hand this to you, and you could flip through the pages.

I want to ask you if you have seen this before.  So I'm just going to scroll through the

EXHIBIT C TO JOINT STATUS REPORT
**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

16

pages.  It will just take a moment.  At the moment, just glance through these.

Q   I'm going to go back to the first page, and I just want to start off by asking you, have you ever seen this document before?

A   No.

Q   Were you aware before today that there was a manual for the prime coater machine?

A   5th Amendment.

Q   I'm going to turn to page five.  I'll zoom in just a little bit.  Do you see at the top, it says cleaning, caution?

A   Yes.

Q   Do you see that item two says, stop machine before cleaning pans or wiping rolls, and (wipe, then jog, wipe, then jog).

And my question is, were you aware before today that the manufacturer of the prime coater warned that the machine has to be stopped before wiping the rolls?

A   5th Amendment.

Q   Does it surprise you at all that that is part of the manufacturer's warning?

A   5th Amendment.

Q   Do you know if the managers or

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

17

supervisors had a copy of this manual?

A    5th Amendment.

Q    Do you know if the managers or supervisors before Mr. Reyes was killed knew that it was dangerous to wipe the rolls while the machine was operating?

A    5th Amendment.

Q    Before the accident, did you personally ever clean the rolls on the prime coater while the machine was operating?

A    5th Amendment.

Q    At any time since the accident, have you cleaned the rolls on the prime coater while the machine is operating?

A    5th Amendment.

Q    At any time before the accident, did you see mister -- first of all, are you familiar with --

MR. PAWK:  Jud, you skipped.  We lost half of that question.

MR. DEAN:  Sorry.

Q    Are you familiar with the plant manager, Mr. McKissick?

A    Yes.

Q    At any time before the accident, did you

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

18

ever see Mr. McKissick cleaning the rolls on the prime coater while the machine was operating?

A   5th Amendment.

Q   You are familiar with who Mr. Wissinger is?

A   Yes.

Q   At any time before the accident, did you see Mr. Wissinger clean the rolls on the prime coater while the machine was operating?

A   5th Amendment.

Q   You are familiar with who Mr. Mahon is?

A   Mahon?

Q   Mahon.

A   Yes.

Q   At any time before the accident, did you ever see Mr. Mahon cleaning the rolls on the prime coater while the machine was running?

A   5th Amendment.

Q   If any managers or supervisors claimed that they were unaware before the accident that employees cleaned the rolls of the prime coater while the machine was running, what would your response be?

A   5th Amendment.

Q   If any managers or supervisors blamed

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

19

the accident on Mr. Reyes, what would your response be?

A    Amendment.

Q    Did you ever hear a supervisor say that the rolls should be cleaned while the machine was running, because turning it off would take too much time?

A    5th Amendment.

Q    Are you aware of any employees being disciplined for turning off the prime coater before cleaning the rolls?

A    Amendment.

Q    If you look back at page five of DOL 5, do you see item No. 5 says never remove guards while machine is running?

A    Yes, I see it.

Q    At any time before Mr. Reyes was killed, did you ever observe any guards on the prime coater?

A    5th Amendment.

Q    Did you ever hear about the prime coater machine having any guards at any time, even if you didn't see them?

A    5th Amendment.

Q    At any time before the accident, did you

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

20

ever hear that the company was intending to install guarding on the machine?

A    5th Amendment.

Q    I'm going to turn to page 15 of DOL 5.

Do you see this line about ten lines down, where it says safety precautions?

A    Yes.

Q    Do you see item two says disconnect and lockout all power sources before doing any maintenance on equipment or cleaning equipment?

Do you see that?

A    Yes, I see it.

Q    Are you familiar with the term lockout/tagout?

A    Yes.

Q    Can you give me your general understanding of what that means?

A    5th Amendment.

Q    Based on your familiarity with the prime coater, can you explain to me how you would go about locking out that machine?

A    5th Amendment.

Q    Were you ever trained on lockout/tagout for the prime coater before the accident?

A    5th Amendment.

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

21

Q   Have you ever seen any written lockout/tagout procedures for the prime coater?

A   5th Amendment.

Q   Were you trained on lockout/tagout for any other equipment at the plant before the accident?

A   5th Amendment.

Q   Have you been trained on lockout/tagout for any machine since the accident?

A   5th Amendment.

Q   At any time before the accident, did you personally ever lockout and tagout the prime coater?

A   5th Amendment.

Q   Before the accident, did you ever see anyone else lockout the prime coater machine?

A   5th Amendment.

Q   At any time before the accident, were you specifically instructed by a manager or supervisor to clean the rolls on the prime coater without turning off the machine?

A   5th Amendment.

Q   Do you know whether, at the time of the accident, Mr. Reyes had been specifically instructed to clean the rolls on the machine

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

22

while it was operating?

A   5th Amendment.

Q   Turning to page 11 of DOL 5 -- I'm sorry.  Go back a second.

Going back to page 15, we were looking at that list of items, and I asked you about No. 2.  Scrolling down, do you see item 11, which says identify locations of emergency stop push-buttons and trip bars before operating equipment?

Do you see that?

A   Yes, I see it.

Q   Do you have a general understanding of what emergency stop push-buttons are?

A   5th Amendment.

Q   Do you know if the prime coater has any emergency stop buttons?

A   5th Amendment.

Q   Do you know what a trip bar is?

A   5th Amendment.

Q   Did you at any time before the accident ever trip a trip bar on the prime coater?

A   5th Amendment.

Q   Did you ever use an E-stop on the prime coater?

A   5th Amendment.

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

23

Q    At any time since the accident, have there been any changes in the rules or procedures at the plant for cleaning the rolls on the prime coater?

A    5th Amendment.

Q    At any time since the accident, has there been any training in terms of how to clean the rolls on the prime coater?

A    5th Amendment.

Q    Since the accident, is it now required to lockout the prime coater before cleaning the rolls?

A    Amendment.

Q    Since the accident, have you personally ever cleaned the rolls on the prime coater while the machine is running?

A    5th Amendment.

Q    Since the accident, have you seen any other employees cleaning the rolls on the prime coater while it was running?

A    Amendment.

Q    Since the accident, have you seen any managers or supervisors cleaning the rolls on the prime coater while it was running?

A    5th Amendment.

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

24

Q    After the accident, did the plant make any changes to the guarding on the prime coater machine?

A    Amendment.

Q    Are you familiar with someone named Jim Boyle, B-O-Y-L-E?

A    Yes.

Q    Who is he?

A    The owner.

Q    Owner, did you say?

A    One of the owners, yeah.

Q    Have you ever met Mr. Boyle in person?

A    Maybe once.

Q    Was that at the plant?

A    Yes, I believe so.

Q    Did you speak with him?

A    Might have shook his hand when I first met him.

Q    And did you speak with him at all?

A    No.

Q    I'm going to show you another exhibit. This is DOL 6.

(Thereupon, Exhibit DOL 6 was marked for identification.)

Q    This is four pages, and, again, I'm just

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

25

going to scroll through and ask you if you have seen this before.

And going back to the top of the first page, do you see that it says equipment lockout/tagout procedure?

A   Yes, I see it.

Q   Have you ever seen this document before?

A   Yes.

Q   When was the most recent time you have seen this?

A   5th Amendment.

Q   When was the first time you ever saw this document?

A   Amendment.

Q   Did you see this document at some point before Mr. Reyes' accident?

A   5th Amendment.

Q   Did you ever receive any training on the procedures in this document?

A   5th Amendment.

Q   I'm going to scroll down to the bottom, or the end of the second page.  I'm going to zoom in just a little bit.

Do you see the sentence that starts off, "this procedure"?

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

26

A  Yes.

Q  Can you just read that to yourself and let me know when you are done, please?

A  All right.

Q  Before today, had you ever heard of a maintenance lockout/tagout safety development and training committee?

A  5th Amendment.

Q  Is there anything else you can tell me about this written lockout/tagout procedure?

A  5th Amendment.

Q  I'm going to show you another exhibit. This has been marked DOL 7.

(Thereupon, Exhibit DOL 7 was marked for identification.)

Q  It is seven pages.  Let's start off just looking at the first page.  I'll scroll down to the bottom of the first page.

Do you see at the top, it says Vorteq Coil Finishers training attendance form?

A  Yes.

Q  And it has a list of attendees.  Am I correct that your name and signature are not on this page?

A  Correct.

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

27

Q    Did you ever sign your name on any training attendance form?

A    5th Amendment.

Q    One more document.

This is DOL 8.

(Thereupon, Exhibit DOL 8 was marked for identification.)

Q    It is just a one paged document.  I'll scroll down to the bottom.

Do you see at the top it says employee warning record?

A    Yes.

Q    Have you ever seen this kind of document before?

A    5th Amendment.

Q    Have you ever received an employee warning record?

A    5th Amendment.

Q    Have you ever been disciplined for anything at the plant?

A    5th Amendment.

Q    Is there a rule at the plant that you are required to wear safety glasses?

A    5th Amendment.

Q    Do you know if any of the managers or

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

28

supervisors get paid different amounts, depending on the kind of job that is running?

A    5th Amendment.

Q    Do you know if any managers or supervisors get paid more or less, depending on production?

A    5th Amendment.

Q    Do you feel that management and supervisors generally prioritize production over safety at the plant?

A    5th Amendment.

Q    Have you personally ever made any complaints about safety issues?

A    5th Amendment.

Q    Was there anyone in charge of safety at the plant, before the accident?

A    5th Amendment.

Q    As a maintenance technician, have you ever performed any maintenance on the prime coater?

A    5th Amendment.

Q    I'm going to show you a photograph. This has been marked DOL 1.

(Thereupon, Exhibit DOL 1 was marked for identification.)

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

29

Q    Can you see that photo?

A    Yeah, I see it.

Q    Do you recognize this as the prime coater machine?

A    Yes, sir.

Q    Would you agree with me this is the front of the machine?

A    Yes.

Q    Do you see this brown rectangle at the bottom left of the photo?

A    Yes.

Q    Can you tell me what that is?

A    I can't really tell.

Q    Based on your familiarity with the prime coater machine, do you know if there is any kind of brown plank or surface at the front of the machine, on the ground?

A    Not that I can recall.  I know what it is.  I don't know if that is just a clean floor from after they cleaned it up.

Q    As part of being a maintenance technician, do you sometimes stand at the front of the machine to observe the process and see if there are any problems?

A    5th Amendment.

EXHIBIT C TO JOINT STATUS REPORT

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

30

Q   If you ever do that, would you say you stand within a foot or two of the rolls of the machine?

A   5th Amendment.

Q   All right, Mr. Trinkley, it is 10:55.  I want to take a ten minute break, and then I'll see if I have any additional questions for you. So we'll be back around 11:05.  Okay?

A   Okay.

(Recess taken.)

Q   Mr. Trinkley, I just have a few more questions.  Mr. Trinkley, are you concerned that if you speak openly and honestly with me today, that Vorteq will retaliate against you?

A   5th Amendment.

Q   Are you aware of any employees who have spoken with OSHA and have been retaliated against by the company?

A   5th Amendment.

Q   Are you aware of any employees who have been pushed out of the company because they have spoken with OSHA?

A   5th Amendment.

Q   All right.  That is all I have, Mr. Trinkley.

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

EXHIBIT C TO JOINT STATUS REPORT
**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

31

Thank you for your time.

A    Thank you.

(Thereupon, the administrative interview was concluded at 11:05 a.m.)

_ _ _

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Trinkley**

32

CERTIFICATE

COMMONWEALTH OF PENNSYLVANIA, )
                               )  SS:
COUNTY OF ALLEGHENY.           )

     I, Tristan Hannaford, do hereby certify that before me, a Notary Public in and for the Commonwealth aforesaid, personally appeared MICHAEL TRINKLEY, who then was by me first duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth in the taking of his oral administrative interview in the cause aforesaid; that the testimony then given by him as above set forth was by me reduced to stenotypy in the presence of said witness, and afterwards transcribed by means of computer-aided transcription.

     I do further certify that this administrative interview was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

     I do further certify that I am not a relative, counsel or attorney of either party, or otherwise interested in the event of this action.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Pittsburgh, Pennsylvania, on this 30th day of August, 2024.

*Tristan Hannaford*
_____
     Tristan Hannaford, Notary Public
     My commission expires September 17, 2027

                    - - -

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**