IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LORI CHAVEZ-DEREMER,[1] SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR<br><br>  Plaintiff,<br><br>  v.<br><br>MICHAEL TRINKLEY, TIMOTHY BARKLEY, ETHAN SIMMONS,<br><br>  Defendants. | 2:24-CV-00426-CCW |

**OPINION AND ORDER**

Secretary of the United States Department of Labor Lori Chavez-DeRemer seeks to compel Respondents Michael Trinkley, Timothy Barkley, Sr., and Ethan Simmons to appear for a second round of administrative interviews with the Occupational Safety and Health Administration ("OSHA") to answer certain questions which Respondents have until now refused to answer on the basis of their Fifth Amendment privilege against self-incrimination. *See* ECF Nos. 35, 45. For the reasons discussed below, the Court will require Messrs. Trinkley and Barkley to answer OSHA's questions, but not Mr. Simmons.

**I.  Background**

The Secretary initiated this case to compel Respondents to comply with administrative subpoenas *ad testificandum* issued by OSHA. ECF Nos. 1, 2. Respondents are employees of Vorteq Coil Finishers, LLC ("Vorteq"), and the Secretary sought to procure their testimony as part of OSHA's investigation into Vorteq stemming from a fatality at Vorteq's plant in Valencia,

---

[1] Secretary Chavez-DeRemer is substituted as Plaintiff in this matter for former Acting Secretary Julie A. Su. Fed. R. Civ. P. 25(d).

Pennsylvania. ECF No. 2. Specifically, on September 5, 2023, Vorteq employee Joe Reyes died after he was pulled into a "prime coater" machine that he was cleaning while it was in operation. *Id.* at 11.

In connection with the incident that led to Mr. Reyes' death, OSHA referred Vorteq to the Department of Justice for a criminal investigation pursuant to § 17(e) of the OSH Act.[2] ECF No 35-1 at 2. After considering the parties' briefing on the Secretary's motion to enforce the administrative subpoenas, the Court granted that motion in part,[3] and ordered Respondents to "comply with OSHA's administrative subpoenas . . . and provide sworn testimony in the presence of a court reporter[.]" ECF No. 28.

Respondents appeared for administrative interviews with OSHA, but refused to answer an aggregate 227 questions on the basis of their Fifth Amendment privilege against self-incrimination. ECF No. 35 at 1. The Secretary moved for an order declaring Respondents' Fifth Amendment invocations invalid, and compelling Respondents to appear again for a second set of interviews and answer the questions which they had refused to answer. *Id.* at 2–3. The Court held a status conference to discuss the Respondents' Fifth Amendment invocations. ECF No. 43. During the conference, it became clear that Respondents would agree to answer certain questions which they had previously refused to answer. Accordingly, after that conference, the Court ordered Respondents to provide the Secretary with a list of questions which Respondents would agree to answer notwithstanding their prior assertions of Fifth Amendment privilege. ECF No. 44.

---

[2] Section 17(e) of the OSH Act states in relevant part: "Any employer who willfully violates any standard, rule or order promulgated pursuant to section 6 of this Act, or of any regulations prescribed pursuant to this Act, and that violation caused death to any employee, shall, upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than six months or by both[.]" 29 U.S.C. § 666(e).

[3] The Court denied-in-part the motion to the extent the Secretary sought to disqualify Respondents' counsel. ECF No. 28.

2

Respondents did so, and the parties filed a joint status report informing the Court that there were still 67 questions that Respondents refused to answer. ECF No. 45 at 1–2.

In the same status report, the Secretary averred that Respondents had not provided any explanation of how their answers to the remaining questions could subject them to criminal liability. *Id.* at 2–3. Thus, the Secretary requested that "Respondents be ordered to provide the Court with enough information to allow the Court to review the specific remaining questions." *Id.* at 4. The Secretary had "no objection to such information being provided to the Court *in camera* for the Court's review." *Id.* Accordingly, the Court ordered Respondents to "make an *ex parte* submission to the Court including a list of questions which they refuse to answer based on their [Fifth] Amendment privilege." ECF No. 46. That order further instructed Respondents to "(1) identify which Respondent refuses to answer each question with a corresponding citation to the interview transcript where the question was asked, and (2) provide additional information regarding the basis for each Respondent's [Fifth] Amendment invocation in response to each question" so that the Court could determine whether those invocations were proper. *Id.* Respondents timely made their *ex parte* submission. And in the interim, the Secretary informed the Court that the Department of Justice's criminal investigation into Vorteq had closed. ECF No. 47. The dispute over Respondents' remaining Fifth Amendment invocations is now ripe for resolution.

**II.     Legal Standard**

The Fifth Amendment to the United State Constitution provides, in pertinent part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. "The Fifth Amendment right against self-incrimination can be invoked 'in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory[.]'"

3

*Williams v. Baker*, No. 15CV0402, 2017 WL 1282455, at *2 (W.D. Pa. Apr. 6, 2017) (Schwab, J.) (quoting *Kastigar v. United States*, 406 U.S. 441, 444, (1972)). "As a general matter, a court should allow a witness to invoke his Fifth Amendment privilege only if the hazard of incrimination is 'substantial and real, and not merely trifling or imaginary.'" *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 371 (3d Cir. 2004) (quoting *United States v. Apfelbaum*, 445 U.S. 115, 128 (1980)); *see also Zicarelli v. N.J. State Comm'n of Investigation*, 406 U.S. 472, 478 (1972) ("It is well established that the privilege protects against real dangers, not remote and speculative possibilities."). Thus, "it must be 'evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation why it cannot be answered might be dangerous because injurious disclosure could result.'" *Donovan v. Spadea*, 757 F.2d 74, 78 (3d Cir. 1985) (quoting *Hoffman v. United States*, 341 U.S. 479, 486–87 (1951)).

That said, once a witness invokes their Fifth Amendment privilege, "the burden falls to the government to 'make it perfectly clear that the answers sought cannot possibly tend to incriminate.'" *United States v. Morton*, 993 F.3d 198, 205 (3d Cir. 2021) (quoting *United States v. Yurasovich*, 580 F.2d 1212, 1221 (3d Cir. 1978)). Furthermore, "[t]he Fifth Amendment's protections include more than just 'evidence which may lead to criminal conviction[.]'" *Id.* at 203 (quoting *Maness v. Meyers*, 419 U.S. 449, 461 (1975)). Rather, the Fifth Amendment privilege also attaches to "information which would furnish a link in the chain of evidence that could lead to prosecution, [or] evidence which an individual reasonably believes could be used against him in a criminal prosecution." *Id.* (quoting *Maness*, 419 U.S. at 461).

**III.    Analysis**

Respondents refused to answer 67 questions based on their Fifth Amendment privilege: Mr. Simmons refused to answer 34 questions, Mr. Trinkley refused to answer 20 questions, and

4

Mr. Barkley refused to answer 13 questions. ECF No. 45 at 1–2. The Court has reviewed those questions and Respondents' reasons for refusing to answer them, as set forth in their *ex parte* submission. The Court will first discuss the propriety of Messrs. Trinkley and Barkley's Fifth Amendment invocations, and then turn to Mr. Simmons.

      **A.**     **Michael Trinkley and Timothy Barkley, Sr. Must Answer OSHA's Questions**

The 33 questions that Messrs. Trinkley and Barkley refused to answer all relate in some way to the prime coater machine, related safety procedures, and Mr. Reyes' death. *See generally* ECF Nos. 45-3, 45-4. For example, Mr. Trinkley invoked the Fifth Amendment and refused to answer questions like "[d]o you know if before the accident any managers or supervisors were aware of any employees getting injured on the prime coater[,]" and "[w]ere you aware before today that there was a manual for the prime coater machine?" ECF No. 45-3 at 14:15–18, 16:7–9. Similarly, Mr. Barkley invoked the Fifth Amendment in response to questions like "[a]t any time since the accident, has there been any training on how to clean the rolls on the prime coater[,]" and "[i]s lockout/tagout now required on the prime coater before cleaning the rolls?" ECF No. 45-4 at 25:1–7. The Secretary argues that the answers to these questions and others like them could not possibly subject Messrs. Trinkley or Barkley to criminal liability.[4] ECF No. 35-1 at 8–10; ECF No. 45 at 2–4. The Court agrees with the Secretary.

From the outset, Messrs. Trinkley and Barkley have maintained that they properly invoked their Fifth Amendment privilege because the Secretary referred Vorteq to the Department of Justice for a criminal investigation in connection with Mr. Reyes' death, and that investigation was ongoing at the time that Respondents invoked the Fifth Amendment. *See* ECF No. 40 at 8, 10–11;

---

[4] The Secretary recognizes, however, that there may be scenarios where Respondents could properly invoke their Fifth Amendment privilege in response to other questions, just not the questions currently at issue. *See* ECF No. 35-1 at 9 n.4.

ECF No. 45 at 5.  But the Department of Justice's criminal investigation has now been closed. ECF No. 47.  So, however reasonable the fear of individual criminal prosecution may have been in light of the active criminal investigation into Vorteq, it is certainly less so now.  Furthermore, neither Mr. Trinkley nor Mr. Barkley is a managerial employee that could face supervisory liability for the incident that led to Mr. Reyes' death or any other violations.  *See* ECF No. 40 at 1 ("Respondents [Trinkley and Barkley] are nonmanagement employees[.]");  ECF No. 2-2 ¶ 10 (explaining that Messrs. Trinkley and Barkley "work in the maintenance department").  And neither of them was present at Vorteq's Valencia facility at the time of Mr. Reyes' death.[5]  Given all of that, the Court finds that Messrs. Trinkley and Barkley did not have a reasonable basis to fear potential criminal liability from answering questions regarding Vorteq's safety trainings and procedures, or whether Vorteq's management knew about prior incidents where injuries had occurred.[6]

Messrs. Trinkley and Barkley also argue that OSHA appears to be relying on "false information" from another source, and if they "testified contrary to this erroneous information provided to [OSHA], they could be deemed to have testified falsely and subjected to the penalties set forth in [18 U.S.C. § 1001]."  ECF No. 40 at 9.  In other words, Messrs. Trinkley and Barkley contend that because they believe that OSHA is relying on false information in at least some

---

[5] While Respondents aver that each of them "was working" on the day of Mr. Reyes' death, "interacted" with Mr. Reyes, and "had various shared tasks and responsibilities relative to the equipment and production involved[,]" ECF No. 40 at 8–9, it is clear to the Court based on Respondents' *ex parte* submission that neither Mr. Trinkley nor Mr. Barkley was present at Vorteq's Valencia facility at the time of Mr. Reyes' death.

[6] In their *ex parte* submission, Messrs. Trinkley and Barkley also raise concerns about certain serious allegations levied at Vorteq employees as a class, and argue that their answers might be used against them in any criminal prosecution stemming from those allegations.  The Court is not aware of any investigation or proceeding relating to those allegations.  In addition, Messrs. Trinkley and Barkley have not shown that those allegations are directed at them specifically, and the allegations involve conduct which is not the subject of OSHA's or the Department of Justice's investigations.  Accordingly, the Court does not find that the existence of these allegations raises a reasonable fear that Messrs. Trinkley and Barkley's answers to the current disputed questions could be used against them in a criminal proceeding.

6

respects, it is possible that OSHA *may* be relying on other false information that *could* contradict any answers Messrs. Trinkley and Barkley give in response to specific questions, such that their truthful answers could subject them to prosecution for giving false testimony. But nothing in the record or in Respondents' *ex parte* submission describes the scope of the purported falsities being relied on by OSHA such that it would be reasonable for Respondents to fear that their answers to the specific questions at issue could be used against them.[7] In the Court's view, Respondents' fear that their answers to specific questions could contradict unspecified "false information" and lead to potential criminal liability is purely speculative, and is not a proper basis for invoking the Fifth Amendment privilege against self-incrimination. *See Zicarelli*, 406 U.S. at 478 ("[T]he privilege protects against real dangers, not remote and speculative possibilities.").

For the foregoing reasons, the Court concludes that Messrs. Trinkley and Barkley's Fifth Amendment invocations were not valid with respect to the 33 disputed questions, and they must now answer those questions.

### B.   Ethan Simmons Properly Invoked His Fifth Amendment Privilege

The 34 questions that Mr. Simmons refused to answer based on his Fifth Amendment privilege generally cover the same topics as the questions posed to Messrs. Trinkley and Barkley. For example, Mr. Simmons refused to answer questions like "[p]rior to that accident . . . did you consider the prime coater machine to be a dangerous machine," and "[w]ould you have known

---

[7] This is especially true considering the number and nature of the questions which Respondents *have* agreed to answer. After the Court held a status conference on the Fifth Amendment issue, the parties met and conferred and filed a status report explaining that Respondents had agreed to answer many questions for which they had previously invoked the Fifth Amendment. ECF No. 45. The parties identified those questions which Respondents agreed to answer by attaching Respondents' interview transcripts as exhibits and highlighting the relevant questions in red. *Id.* at 1–2. For example, Mr. Trinkley initially refused, but later agreed to answer the question "[a]t any time since the accident, have there been any changes in the rules or procedures at the plant for cleaning the rolls on the prime coater?" ECF No. 45-3 at 23:1–4. It is not clear why Mr. Trinkley would agree to answer that question, but not others, if the basis for his continued invocation of the Fifth Amendment is the fear that his answers may contradict "false information" provided to OSHA.

before the accident how to go about locking out the prime coater?" ECF No. 45-2 at 18:20–23, 29:5–7. As with Messrs. Trinkley and Barkley, the Secretary argues that these questions and others like them cannot possibly tend to incriminate Mr. Simmons. ECF No. 35-1 at 8–10; ECF No. 45 at 2–4. The Court disagrees, and concludes that Mr. Simmons properly invoked his Fifth Amendment right to refuse to answer those questions.

Unlike Messrs. Trinkley and Barkley, Mr. Simmons was a machine operator who was present at Vorteq's Valencia facility on the day of Mr. Reyes' death and, based on a declaration submitted by OSHA at the outset of this case, Mr. Simmons "[was] the individual who first discovered [Mr. Reyes] shortly after the fatal accident." ECF No. 2-2 ¶ 10. Because Mr. Simmons was a "machine operator" in close proximity to a workplace fatality caused by a machine, it is reasonable to for him to fear that his answers to OSHA's questions could be used against him, especially where the fatality prompted a criminal investigation by the Department of Justice. Furthermore, Mr. Simmons has held a management position at Vorteq since January 2024 and could therefore reasonably fear potential liability as a supervisor for any violations occurring since his promotion. ECF No. 45 at 5–6. Indeed, at the status conference on Respondents' Fifth Amendment invocations, counsel for the Secretary acknowledged that managers had a more "plausible" basis for invoking the Fifth Amendment. On balance, the Court finds that it is "evident from the implications of the question[s] [posed to Mr. Simmons], in the setting in which [they were] asked, that a responsive answer to the question[s] or an explanation why [they could not] be answered might be dangerous because injurious disclosure could result.'" *Donovan v. Spadea*, 757 F.2d at 78. Accordingly, the Court concludes that Mr. Simmons properly invoked his Fifth Amendment privilege against self-incrimination with respect to the 34 disputed questions.

## IV.     Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED that Respondents Trinkley and Barkley Fifth Amendment invocations were invalid.  Mr. Trinkley must answer the 20 questions that he refused to answer on Fifth Amendment grounds, and Mr. Barkley must answer the 13 questions that he refused to answer on Fifth Amendment grounds.  IT IS FURTHER ORDERED that Respondent Simmons properly invoked the Fifth Amendment, and he need not answer the 34 questions for which he invoked the privilege.

DATED this 2nd day of October, 2025.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record